*NOT FOR PUBLICATON*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAYDEVI JOSHI, <br><br> Plaintiff, <br><br> v. <br><br> PUBLIC CONSULTING GROUP, INC., <br><br> Defendant. | Civil Action No. 22-1848 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge:**

Plaintiff Jaydevi Joshi ("Plaintiff") brought this employment discrimination action against defendant Public Consulting Group ("Defendant" or "PCG") under Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination ("LAD"). Plaintiff alleges that she was subjected to a hostile work environment and religious discrimination while employed at PCG. Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Amended Complaint for failure to state a claim under Fed. R. of Civ. P. 12(b)(6). For the reasons set forth below, Defendant's Motion to Dismiss is **DENIED**.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion, the Court takes the allegations in the Amended Complaint as true. PCG hired Plaintiff in June 2017 as an Executive Director / Project Manager. (Plaintiff's Amended Complaint ("Am. Compl."), ¶ 17, ECF No. 8.) During her tenure at PCG, Plaintiff directly reported to Senior Consultant / Project Manager, Heather Gann. (*Id.* ¶ 18.) Plaintiff alleges that in fall or winter of 2019, Gann discussed her religion, Christianity, with Plaintiff during one-on-one meetings. (*Id.* ¶ 20.) In one meeting, Gann allegedly told Plaintiff that she was

involved in her church, taught Sunday school, and did not consume alcohol or curse due to her religious beliefs.  (*Id*. ¶ 23.)  Plaintiff understood Gann to be attempting to convert Plaintiff to Christianity.  (*Id*. ¶ 21.)  On a second occasion, Plaintiff allegedly disclosed to Gann that she was a practicing Hindu, with the intention to discourage Gann from attempting to convert Plaintiff to Christianity.  (*Id*. ¶¶ 26-27.)  Plaintiff allegedly refrained from reporting Gann's conduct at the time out of fear of retaliation.  (*Id*. ¶ 25.)

On April 4, 2020, Gann allegedly sent an email from Gann's personal email account to Plaintiff's personal email account.  (*Id*. ¶ 29.)  Gann attached a letter to the email.  In the body of the email, Gann allegedly asked Plaintiff to "consider that [the letter] is coming from a place of concern."  (*Id*.)  The letter stated the following:

> As a Christian, I have long studied and been aware of all of the teachings in the Bible, specifically, the book of Revelation….
>
> I realize that this is coming from a place of my own beliefs. I'm also not trying to push anything on you, but with today's events unfolding before us, I can't help but think about what my Christian faith teaches about the Lord's Second Coming. I understand to even "unpack" this and give it some serious consideration, you have to have some level of faith and spiritual understanding or desires. We haven't talked much about religion, other what your family background is and what Sara's dad believes, and that I teach Sunday School and I know you're aware I'm pretty active in my church….
>
> I do want to just ask you a simple question … "Do you know, if you were to die today, where you would spend eternity?"
>
> I realize that's probably coming out of left field, and please don't be offended, I only ask because I've never discussed this with you and I have a burden on my heart to tell you about it. I also know that you CAN have that certainty, AND I care enough about you that I want to ask.
>
> It is possible to know. I know. I accepted Christ as my Savior when I was 14 years old. I haven't lived a perfect life by any means since then, but I do strive to honor Him with my life. I know that my faith

is real because I have seen God's hand work in my heart and in my life SO many times over the years.

I have been feeling quite convicted about not sharing my faith with you since we've worked together for so long and I would be remiss and not at all what I should be- as someone who cares about you- as someone who believes that each of us will spend eternity in either heaven or hell- if I didn't share/ ask you that question.

The truth is, we will all spend eternity somewhere. I understand that religions and religious views differ, and I'm not trying to push mine on you. But, if you have ever pondered that question, or wondered about life after this, the Bible gives us a very clear path to salvation, and I've included it below. I do hope that you'll take the time to review it….

To get the assurance that heaven will one day be your home, there is a very simple process to follow. All you have to do is:

1. Admit that you're a sinner. We all are! Even our "good works" them Bible tells us, are as "dirty rags" in His sight. The Bible tells us, "… there is none righteous, no, not one." Romans 3:10

2. Ask God for forgiveness of your sins and believe in your heart that HE is the only way to salvation and eternal life. "For whosoever shall call upon the name of the Lord shall be saved." Romans 10:13

3. Believe in God's power to save you. We can't save ourselves. "For God so loved the world that He gave his only begotten Son, that whosoever believeth in Him should not perish, but have everlasting life." – John 3:16

4. Pray and ask Him to come into your heart. It's that easy!! I'm not asking you to start going to church, convert over to any "religion", or to do anything else. All we have to do is ask Him to save us and he will! The Bible tells us, "Behold, I stand at the door and knock; if any man hear my voice, and open the door, I will come in to him…" – Revelations 3:20….

Consider for a moment the peace that you can have in your life if you KNEW where you would spend eternity!!

Thank you for allowing me to share this with you. Again, I value you and had this burden to share this with you and I trust that you will take this for what it is, a genuine interest in your soul's eternal security.

(April 4, 2020 Letter.)  According to Plaintiff, she understood Gann's letter as an attempt to convert Plaintiff to Christianity, but again, did not immediately report the letter out of fear of retaliation. (Am. Compl., ¶¶ 31, 33.)  Following the receipt of Gann's letter, Plaintiff expressed no interest in converting to Christianity.  (*Id*. ¶ 35.)  As a result, Plaintiff alleges that Gann immediately began to treat her in a more hostile and dismissive manner than other non-Hindu employees.  (*Id*.)  For instance, Plaintiff alleges that as pretext for religious discrimination, Gann began belittling Plaintiff in front of Plaintiff's team, direct reports, and clients; unjustly criticized Plaintiff's performance, including subjecting Plaintiff to disciplinary action; refused to provide Plaintiff with requested support and assistance; and spoke over Plaintiff and did not allow Plaintiff to share her perspective.  (*Id*. ¶ 35.)  Plaintiff alleges that she was treated in a more hostile manner than her non-Hindu colleagues for over a year before she was terminated by Gann.  According to Plaintiff, she was never subjected to these alleged acts until she refused to convert to Christianity. (*Id*. ¶¶ 35, 41.)

On April 22, 2021, Plaintiff alleges that Gann and Nancy Dalonzo of Human Resources called Plaintiff to terminate her employment citing "unprofessional behavior."  (*Id*. ¶¶ 36, 38.) Plaintiff avers that Defendant's stated reason is a pretext for religious discrimination, including Plaintiff's refusal to convert to Christianity.  (*Id*. ¶ 39.)  That same day, following her termination, Plaintiff allegedly forwarded Gann's letter to William Mosakowski, Chief Executive Officer at PCG, and Dalonzo.  (*Id*. ¶ 42.)  In the email to Mosakowski and Dalonzo, Plaintiff stated that she felt the letter "was religious harassment, yet . . . said nothing as [she] feared the possibility of losing [her] job."  (*Id*.)  Further, Plaintiff averred that "Heather [Gann] ha[d] several times spoken down to [her] in public in front of fellow subordinates, as well as seemingly targeted [her] as seen

by fellow employees." (*Id*.)  In response, Plaintiff alleges that she received an email from Dalonzo in which Dalonzo stated that PCG would "handle this matter internally." (*Id*. ¶ 43.)

On August 2, 2021, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (*See* Am. Compl., Ex. A.) In February 2022, the EEOC declined to proceed with the investigation.  However, the EEOC made no determination about whether further investigation would establish violations of Title VII and the LAD.  (*Id*. Ex. B.) On April 1, 2022, Plaintiff timely filed a two-count complaint alleging subjection to a hostile work environment and discrimination in violation of Title VII and LAD.  In response to an initial motion to dismiss filed by Defendant, Plaintiff filed an Amended Complaint.  Now, Defendant moves to dismiss that complaint.  (*See* Defendant's Motion to Dismiss Plaintiff's Amended Complaint ("Mot. to Dismiss"), ECF No. 9.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *United Van Lines, LLC v. Lohr Printing, Inc.*, No. 11–4761, 2012 WL 1072248, at *2 (D.N.J. Mar. 29, 2012).

When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  While Federal Rule of Civil Procedure 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

## III.   DISCUSSION

### A.   Plaintiff has Stated Hostile Work Environment Claims.

Defendant argues that Plaintiff failed to adequately plead facts supporting a hostile work environment claim under Title VII or the LAD. (*See* Mot. to Dismiss, pp. 8-13.) Title VII makes it unlawful "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To assert a hostile work environment claim based on religious discrimination, an employee plaintiff must allege: "1) [that] the employee suffered intentional discrimination because of [her religion], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person [of the same religion] in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted); *see also Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 276–77 (3d Cir. 2001). The first four elements establish a hostile work environment while the fifth

element determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Because the same basic principles apply when evaluating Plaintiff's claims under the LAD, the Court proceeds with a single analysis. *See Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603–04 (1993)) (setting forth elements of a hostile work environment claim under the LAD); *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the [LAD] the same as the Supreme Court treats hostile work environment actions under Title VII.") (citation omitted); *Heitzman v. Monmouth County*, 321 N.J. Super. 133, 143–44 (App. Div. 1999) (discussing plaintiff's claim that he was subjected to hostile work environment because he was Jewish and noting that New Jersey courts have relied upon federal court decisions construing Title VII hostile work environment claims when reviewing such claims under LAD).

Here, Defendant argues that Plaintiff's Amended Complaint does not adequately allege severe or pervasive conduct or *respondeat superior* liability.[1] (*See* Defendant's Reply in Support of its Motion to Dismiss ("Def.'s Reply"), pp. 2-6.) To fall within the purview of Title VII, the

---

[1] The parties do not dispute that Plaintiff has plausibly alleged the remaining prongs: intentional discrimination because of religion, that the discrimination detrimentally effected Plaintiff, and that the discrimination would detrimentally affect a reasonable person of the same religion in that position. Indeed, the Court finds that Plaintiff clearly alleges that the differential treatment she received was based on religion. While such treatment could have been motivated by other factors, Plaintiff has specifically alleged that she was treated in a more hostile manner than her non-Hindu colleagues on the basis of her religion. (*See, e.g.*, Am. Compl., ¶ 35.) Such allegations are enough for the present inquiry. Further, in alleging that she was terminated from her job on the basis of religion, and subsequently suffered loss of "earnings and/or earning capacity, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures," Plaintiff has adequately alleged detriment to her person. (*Id*. ¶¶ 47, 49.) Finally, accepting the facts alleged as true, I conclude that the conduct alleged would be enough to detrimentally affect an objective reasonable person. Subjection to inappropriate conversations about one's religion in the workplace, an offensive letter implying an eternity in hell but for the acceptance of God, and multiple instances of alleged differential treatment than colleagues outside of one's religion could certainly engender a hostile working environment to a reasonable individual.

conduct at issue must have been sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile or abusive. *Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 140 (3d Cir. 2012) (citing *Harris v. Forklift Sys., Inc. .*, 510 U.S. 17, 21 (1993)). To determine whether an environment is hostile, courts consider the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel*, 706 F.3d at 168 (citing *Harris*, 510 U.S. at 23). Although the analysis must concentrate on "the overall scenario," isolated incidents can sustain a hostile work environment if extremely serious. *Carver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005) (internal quotations and citation omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988) ("isolated incidents" will amount to harassment if "extremely serious") (quotations omitted); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (quotations omitted) (same); *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (same).

In the instant case, Plaintiff argues that several instances of discriminatory conduct by Gann contributed to a hostile work environment at PCG. (*See* Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"), p. 17.) Specifically, Plaintiff avers that the following conduct supports a plausible hostile work environment claim: (1) one-on-one meetings with Gann in which Gann allegedly discussed Gann's religious beliefs and church involvement; (2) the April 4, 2020 letter Plaintiff received after disclosing to Gann that she was Hindu; (3) alleged differential, worse treatment by Gann after Plaintiff failed to respond to Gann's letter; and (4) Gann's decision to terminate Plaintiff's employment allegedly due to Plaintiff's religion, including Plaintiff's refusal to convert to Christianity. (*Id.*, pp. 17-18.)

Beginning with the alleged April 4, 2020 letter, the Court cannot understate its severity. Indeed, the letter does not constitute a "mere offensive utterance." *Mandel*, 706 F.3d at 168 (citation omitted).  Rather, its religious content is detailed and concerning.  Although Gann allegedly states in her letter that she was not attempting to push her religious views on Plaintiff, she repeatedly asks Plaintiff where, if Plaintiff were to die, she would "spend eternity," and details a "very clear path to salvation" that Plaintiff must follow to ensure that Plaintiff will spend eternity in heaven.  (April 4, 2020 Letter.)  The letter also enumerates several steps that Plaintiff can take to "know" where she will spend eternity, including (1) admitting that Plaintiff is a sinner; (2) asking God for forgiveness for Plaintiff's sins and believing that God is the only way to salvation and eternal life; (3) believing God's power to save Plaintiff, and (4) asking God to come into Plaintiff's heart.  (*Id*.) In sum, in the alleged letter, Gann, as Plaintiff's direct supervisor, sought to influence Plaintiff's religious beliefs by insinuating that Plaintiff would not be in heaven should she not adopt Christianity.

The Third Circuit and its sister Circuits have unequivocally held that an extreme isolated act of discrimination can create a hostile work environment. *See Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) (supervisor's use of racially charged slur in front of African American employees and their non-African-American coworkers accompanied by threats of termination constituted severe conduct that could create a hostile work environment); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015) (en banc) ("[W]e underscore the Supreme Court's pronouncement in *Faragher* . . . , that an isolated incident of harassment, if extremely serious, can create a hostile work environment."); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an

unambiguously racial epithet such as [the "n-word"] by a supervisor in the presence of his subordinates.") (quotation omitted).  Although this incident does not arise in the context of racial discrimination and the use of racial epithets, the Court nonetheless finds it so severe, in a religious context, as to "amount to a change in the terms and conditions of employment."  *Faragher*, 524 U.S. at 788.

Moreover, Plaintiff's allegations also satisfy the alternative "pervasive" standard.  Plaintiff alleges conduct prior to, and in the aftermath of the April 4, 2020 letter, that when viewed alongside the letter, amount to the sort of repeated conduct that may constitute a hostile work environment.  For instance, although the one-on-one meetings with Gann during which Gann shared her religious beliefs could be viewed as innocuous, when considered together with the letter, they plausibly suggest a series of increasingly offensive attempts by Gann to convert Plaintiff to Christianity.  In addition, Plaintiff alleges that Gann began treating Plaintiff in a more hostile and dismissive manner than non-Hindu employees by belittling Plaintiff in front of Plaintiff's team, direct reports, and clients; unjustly criticizing Plaintiff's performance; refusing to provide Plaintiff with requested support and assistance; speaking over Plaintiff; and not allowing Plaintiff to share her perspective.  Indeed, when those acts are evaluated in light of the alleged one-on-one meetings, the April 4, 2020 letter, and Plaintiff's decision not to respond or convert to Christianity, the cumulative effect of these incidents is sufficiently pervasive to plausibly state a hostile work environment claim.  *See Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d 425, 452 (D.N.J. 2009) (explaining that in considering cumulative effect, a court must keep in mind "'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes'") (quoting *Lehmann*, 132 N.J. at 607).

The Court is unpersuaded by Defendant's attempts to analogize this case to others in which the alleged incidents were deemed insufficient to establish a hostile work environment. The facts in those cases are not helpful. First, Defendant points the Court to *Matos v. PNC Fin. Servs. Grp.*, No. CIV. 03-5320, 2005 WL 2656675, at *9 (D.N.J. Oct. 17, 2005). In that case, the plaintiff, a Jehovah's Witness, alleged the following discriminatory actions: that her manager required her to stay late on Fridays in spite of religious meetings; the use of holiday decorations in her workstation; her manager's initial refusal to grant her time off to attend a religious assembly in 1999 and subsequent refusal to permit the plaintiff time off to attend an assembly in 2002; and a single statement by the plaintiff's manager that she must choose between her work or God. *Id*. The court granted the employer's *motion for summary judgment* on the plaintiff's hostile work environment claim, finding that apart from the manager's statement regarding choosing between work and God, none of the acts amounted to "the kind of 'discriminatory intimidation, ridicule, and insult' that can create a hostile work environment." *Id*. Although the court reasoned that a fact finder could have found the manager's statement to be abusive, it did not find the statement sufficiently severe or pervasive. *Id*. Unlike the Jehovah's Witness plaintiff in *Matos*, here, Plaintiff does not complain of a mere offensive utterance. Rather, she alleges that she received a letter from her supervisor, the detailed content of which could be viewed as offensive to Plaintiff's religion such that it could reasonably engender an objective change in conditions of employment. Further, when viewed alongside the letter, the preceding and subsequent incidents are more pervasive than those allegations involved in *Matos*.

Likewise, Defendant's comparison of the facts of this case to those in *Webster* is also unhelpful. In *Webster*, the plaintiff alleged that he was subjected to a hostile work environment because of "repeated comments, statements and harassment based upon his creed," and a single

incident in which his coworker "became angry" with him and his supervisor ordered him to provide a written statement explaining why he could not work on Saturdays. *Webster v. Dolgencorp, LLC*, No. 13-0690, 2013 WL 4501461, at *1 (D.N.J. Aug. 22, 2013). The court dismissed the plaintiff's hostile work environment claim since the plaintiff's allegations of "comments, statements, and harassment," were vague and conclusory, and the isolated incident was not sufficiently severe. *Id.* at *4. In the instant case, however, Plaintiff does not merely complain of vague discriminatory comments or statements. Rather, Plaintiff describes several incidents that, when considered in light of the totality of the circumstances, plausibly suggest a pattern of pervasive religious discrimination. Moreover, a request to provide a written statement regarding religious reasons for abstaining from work on Saturdays is not comparable to a letter allegedly imploring a subordinate to consider where she will spend eternity and listing steps through which she may ensure her salvation.

Next, Defendant argues that Plaintiff has failed to plead the existence of *respondeat superior* liability. (*See* Mot. to Dismiss, pp. 13-15.) "The basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the victim's supervisor or coworker." *Mandel*, 706 F.3d at 169 (citing *Huston*, 568 F.3d at 104). In *Faragher*, the Supreme Court crafted the standard for employer liability, referred to as the "aided by the agency relation test":

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively) higher authority over the employee. When no tangible employment action is taken, a defending employee may raise an affirmative defense to liability or damages. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action. . . .

524 U.S. at 777–78; *see also Lehman*, 132 N.J. at 619 ("An employer whose supervisory employee is acting within the scope of his or her employment will be liable for the supervisor's conduct in creating a hostile work environment.").  When a supervisor takes a tangible employment action against a subordinate employee, the employer is vicariously liable because "'the injury could not have been inflicted absent the agency relation.'" *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 216 (3d Cir. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013)).  Tangible employment actions include employment related actions such as "'discharge, demotion, or undesirable reassignment.'" *Hitchens v. Montgomery Cnty.*, 278 F. App'x 233, 236 (3d Cir. 2008) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Here, Plaintiff alleges that she reported directly to Gann and that Gann terminated Plaintiff's employment during a phone call on April 22, 2021.  (Am. Compl., ¶¶ 18, 36.)  Plaintiff also avers that Gann was a decision-maker in Plaintiff's termination.  (*Id.* ¶ 38.)  Accepting Plaintiff's allegations as true, Plaintiff has plead a "tangible employment action." As such, Defendant's argument that it cannot be liable because it took prompt remedial action to address Plaintiff's concerns is misplaced.  Indeed, Defendant's argument amounts to disputing the facts of whether Plaintiff was terminated based on religious animus. That defense, however, cannot be resolved on a motion to dismiss. *See Dreibelbis v. Cnty. of Berks*, 438 F. Supp. 3d 304, 310 n.10 (E.D. Pa. 2020) (noting that "at the motion to dismiss stage, [courts] do[] not engage in burden-shifting; rather [they] accept[] all well-pleaded factual allegations as true").  Rather it appears that Defendant seeks to provide a legitimate business reason as to why Plaintiff was ultimately terminated from her position.  That argument involves burden shifting not appropriate on a motion to dismiss.  Since Gann was a supervisor of Plaintiff, and Plaintiff allegedly suffered a tangible

employment action, Defendant is plausibly alleged to be subject to vicarious liability.[2]   Thus, Plaintiff states a claim for hostile work environment.

## B. Plaintiff's Religious Discrimination Claims Are Sufficiently Pled.

Next, Defendant claims that Plaintiff's Amended Complaint lacks sufficient detail to state a claim for unlawful discrimination on the basis of religion.   (Mot. to Dismiss, pp. 15-17.) Religious discrimination claims under Title VII and the LAD are "analyzed under the same standard." *Barnes v. Off. Depot, Inc.*, No. 08-1703, 2009 WL 4133563, at *5 (D.N.J. Nov. 24, 2009); *see also Cortes v. Univ. of Med. & Dentistry of N.J.*, 391 F. Supp. 2d 298, 311 (3d Cir. 2005) ("Title VII analysis applies to claims brought under the [LAD]. . . .") (citation omitted).   To establish a prima facie case of discrimination, Plaintiff must show: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 Fed. Appx. 831, 842 (3d Cir. 2016) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999)).

---

[2]      Defendant separately argues that it cannot be held vicariously liable because Gann was not acting in the scope of her employment when she sent Plaintiff an email from her personal account on Saturday, April 4, 2020.   (*See* Def.'s Reply, p. 5.)   I disagree.   Employers may be held vicariously liable if an employee performed discriminatory acts within the scope of his or her employment. *See Cardenas v. Massey*, 269 F.3d 251, 265 (3d Cir. 2001) ("An employer is liable for acts committed by its employees in the scope of their employment, which may include some types of disparate treatment of employees by supervisors, such as discriminatory reprimands or job assignments."); *see also Burlington Indus., Inc.*, 524 U.S. at 754–56.   Here, even assuming that Plaintiff's receipt of Gann's letter did not occur at the workplace, the fact that Gann, as Plaintiff's supervisor, allegedly sent Plaintiff the letter to influence Plaintiff's religion, it was done so in the scope of their professional relationship.   In addition, several other allegedly discriminatory actions, including the one-on-one meetings with Gann, the allegations of differential treatment after the receipt of the April 4th letter, and Plaintiff's termination clearly fall within the scope of employment.

If the plaintiff is able to establish a prima facie case, "'[t]he burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the adverse action." *Tegler v. Glob. Spectrum*, 291 F. Supp. 3d 565, 594–95 (D.N.J. 2018) (citation and internal quotations omitted). At that juncture, "[t]he plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 98 (1990). It is important to note that a plaintiff on a motion to dismiss need not allege this burden shifting framework as his/her prima facie case. In other words, it is sufficient to establish a prima facie case if Plaintiff is able to sufficiently allege the elements of the discrimination claim. *See Castleberry*, 863 F.3d at 266 ("a claim of employment discrimination necessarily survives [a motion to dismiss] . . . so long as the requisite *prima facie* elements have been established"); *Henley v. Brandywine Hosp., LLC*, No. 18-4520, 2019 WL 3326041, at *9 (E.D. Pa. July 24, 2019) ("At the motion to dismiss stage, a plaintiff does not need to *prove* the elements of a prima facie case . . . .") (emphasis added) (citation omitted).

In the instant case, Defendant argues that Plaintiff does not and cannot allege facts sufficient to satisfy the second and fourth elements of a discrimination claim under Title VII and the LAD. (*See* Mot. to Dismiss, p. 16.) The parties do not dispute that Plaintiff, a practicing Hindu, is a member of a protected class, or that Plaintiff suffered an adverse employment action. Thus, the Court only addresses the second and fourth prongs.

Commencing with the second prong, the Court finds that Plaintiff has sufficiently pled her qualifications for her position as Executive Director/Project Manager at PCG. The issue of qualification is "a question of fact" that turns on "whether [a] plaintiff is able to perform or has

satisfactorily performed the job." *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008). A plaintiff is not qualified for a given position if there is objective evidence that she did not possess minimal job requirements, such as a license or comparable prerequisite. *See Cooper v. Thomas Jefferson Univ. Hosp.*, 743 F. App'x 499, 502 (3d Cir. 2018) (opining that it is unlikely that a nurse who lacked a required license for several days while employed was minimally qualified for her position) (citing *Makky*, 541 F.3d at 216).

As to the second prong, Defendant argues that the Amended Complaint is devoid of factual allegations suggesting Plaintiff performed her duties at an acceptable level. (*See* Def.'s Reply, p. 8.) Moreover, Defendant contends that Plaintiff admits that she was terminated for unprofessional behavior. (*See* Mot. to Dismiss, p. 16.) Defendant misconstrues the allegations in Plaintiff's Amended Complaint. In fact, Plaintiff alleges that PCG hired her in June 2017 as an Executive Director / Project Manager, and during her tenure, she consistently demonstrated positive performance and dedication to PCG and performed her duties in a highly competent manner. (Am. Compl, ¶¶ 17, 19.) Contrary to Plaintiff's assertion, although Plaintiff complains that Defendant's purported reason for terminating her employment was based on "unprofessional behavior," she does not admit her behavior was unprofessional in the Amended Complaint. (*Id*. ¶ 38.) Rather, Plaintiff alleges that Defendant's stated reason is "pretext for religious discrimination." (*Id*. ¶ 39.) Accepting Plaintiff's allegations of positive performance as true and absent any allegations as to the lack of educational or other job perquisites, the qualification prong is adequately pleaded.

Next, Defendant argues that the Amended Complaint fails to sufficiently plead facts suggesting any discrimination with respect to Plaintiff's separation from PCG. (*See* Def.'s Reply, p. 8.) A plaintiff may demonstrate "an inference of unlawful discrimination" by showing that "the employer is treating some people less favorably than others because of their . . . religion" and "that

the comparators were 'involved in acts . . . of comparable seriousness to' the plaintiff's acts." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 708 F. App'x 48, 52 (3d Cir. 2017) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). "Similarly-situated employees are those who 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Smith v. ABF Freight Sys., Inc.*, 2007 WL 3231969, at *8 (M.D. Pa. Oct. 29, 2007) (quoting *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002)).

In the instant case, Plaintiff alleges that prior to disclosing her religion to Gann in fall or winter of 2019, she had no indication that her job was in jeopardy or that she was underperforming at work. (Am. Compl., ¶ 41.) However, upon receiving Gann's letter in April 2020, and refusing to convert to Christianity or express any interest in following the steps proscribed in Gann's letter, Plaintiff alleges that Gann began to treat her in a more hostile and dismissive manner than other non-Hindu employees. (*Id.* ¶ 35.) For instance, as stated *supra*, Plaintiff alleges that Gann belittled her; unjustly criticized her performance, including subjecting her to disciplinary action; refused to provide Plaintiff with requested support and assistance; and spoke over Plaintiff and did not allow Plaintiff to share her perspective. (*Id.*) In April 2021, Plaintiff alleges that she was terminated under the pretext of religious discrimination, and her job duties were re-assigned to less qualified, non-Hindu employees. (*Id.* ¶ 40.) Following Plaintiff's termination, Plaintiff alleges that she forwarded the April 4th letter to Human Resources and the CEO of PCG, stating in the email that Gann had "several times spoken down to [Plaintiff] in public in front of fellow subordinates, as well as seemingly targeted [Plaintiff] as seen by fellow employees." (*Id.* ¶ 42.) Further, Plaintiff allegedly wrote that she "had been scared about this for the past year or so" and felt that the

correspondence from Gann was "religious harassment," yet "said nothing as [she] feared the possibility of losing [her] job." *Id*. In sum, according to Plaintiff, her religion was a motivating/and or determinative factor in her termination from PCG.

Nonetheless, Defendant argues that Plaintiff's separation arose from non-discriminatory reasons. Specifically, Defendant points to documents produced to the EEOC such as a final warning on February 9, 2021 for unauthorized disclosure of PCG's intellectual property, a screen shot of a group chat in which Plaintiff had criticized a client, and an email from April 22, 2021 in which Plaintiff allegedly stated that she was terminated due to her own actions. (*See* Mot. to Dismiss, Exs. A-C.) The Court, however, cannot consider these documents as they are not integral to, or referenced by, Plaintiff's Amended Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'") (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996), *superseded on other grounds by* PSLRA, 15 U.S.C. § 78u–4(b)(2)). Defendant cites an earlier decision by this Court, *Cummings v. Princeton University*, in support of its position that the EOCC documents are integral to the Amended Complaint. (*See* Def.'s Reply, p. 10.) While I explained, as a general matter, indisputably authentic documents attached as exhibits to a motion to dismiss may be considered on a motion to dismiss if the plaintiff's claims are based on the document, there, I limited my review of the plaintiff's EEOC file to determine the scope of the plaintiff's claims and whether the plaintiff exhausted administrative remedies. *See Cummings v. Princeton Univ.*, No. 158587, 2016 WL 6434561, at *1 (D.N.J. Oct. 31, 2016). Moreover, unlike documents, such as contracts and prospectuses, that courts have considered in other cases, the EEOC records are not explicitly referenced, or relied

18

upon, by Plaintiff's Amended Complaint.  *See*, *e.g., In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) (considering a prospectus directly challenged by the complaint); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (considering a purchase and sale agreement explicitly referenced in the complaint).  As such, "rather than engage in the problematic task of prematurely weighing allegations in the Amended Complaint against material in the EEOC file at the motion to dismiss stage," I will limit my analysis to the allegations set forth in Plaintiff's Amended Complaint.[3]  *Lightcap-Steele v. KidsPeace Hosp., Inc.*, No. 05-02578, 2006 WL 1147476, at *6 (E.D. Pa. Apr. 27, 2006).

Accepting Plaintiff's version of the facts as true, the Court finds that it is plausible to infer unlawful discrimination behind Plaintiff's termination.  Plaintiff pleads a sequence of events over time that supports Plaintiff's allegation that she was not fired for cause, but for improper religious animus.  Importantly, Plaintiff alleges that she worked without issue under Gann for over two years since joining PCG in June 2017, and was treated in a more hostile manner than similarly situated non-Hindu employees, only after divulging her Hindu religion to Gann and refusing to heed Gann's requests in her letter.  Indeed, Plaintiff's allegations of belittling, criticism, and disciplinary action appear to suggest a pattern of antagonism that also supports causation.  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997) (explaining that "a plaintiff can establish a [causal] link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period" between the protected activity and discharge); *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 313 (W.D. Pa. 2020) (noting

---

[3]      Even if the Court were to consider these documents, Defendant is providing a legitimate business reason as to why Plaintiff was ultimately terminated.  As stated *supra*, such burden shifting is not appropriate at a motion to dismiss.  *See Dreibelbis*, 438 F. Supp. 3d at 310, n.10.

that ongoing antagonism may include evidence of unusually close supervision or aggressive discipline).   Thus, it is no stretch to infer that Plaintiff's dismissal by Gann could have been motivated by discriminatory animus.   *See Smith v. Sec'y USN*, 843 F. App'x 466, 469 (3d Cir. 2021) (finding "an inference of unlawful discrimination . . . where the employer treated a similarly situated employee who was not a member of the plaintiff's protected class more favorably") (citations omitted).   Accordingly, Plaintiff plausibly states claims for religious discrimination under Title VII and the LAD.

**IV.      CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is **DENIED**.   An appropriate Order accompanies this Opinion.

**DATED**: November 30, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge